IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| v. | * Crim. No. MJM-24-129 |
| JAMES BEVERLY, JR., | * |
| Defendant. | * |

* * * * * * * * * *

**MEMORANDUM OPINION**

Defendant James Beverly, Jr. ("Defendant" or "Mr. Beverly") is charged in a three-count Second Superseding Indictment with firearm and drug offenses. ECF No. 76. This matter is before the Court on Defendant's Motion to Suppress Warrantless Search and Derivative Evidence ("Motion to Suppress"). ECF No. 57. The Court has reviewed the parties' written submissions and, on September 12, 2025, heard testimony and oral arguments. For the reasons explained below, Defendant's Motion to Suppress is granted in part and denied in part

**I.   PROCEDURAL HISTORY**

On April 18, 2024, a grand jury returned a three-count Indictment charging Mr. Beverly with: possession of firearm and ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g); possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841; and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). ECF No. 1. The grand jury returned a Superseding Indictment on March 13, 2025, ECF No. 39, and a Second Superseding Indictment on September 25, 2025, ECF No. 76, each charging the same three offenses as the original indictment. Specifically, the Second Superseding

1

Indictment alleges that, on or about February 8, 2024, Mr. Beverly possessed fentanyl and cocaine base with the intent to distribute these controlled substances, unlawfully possessed a .40 caliber semiautomatic handgun with five rounds of ammunition as a prohibited person, and used, carried, and discharged the firearm during and in relation to a drug trafficking crime. *Id.*

On July 17, 2025, Defendant filed two pretrial motions: a Motion to Suppress Statements, ECF No. 56; and a Motion to Suppress Warrantless Searches and Derivative Evidence ("Motion to Suppress"), ECF No. 57. The latter motion seeks suppression of evidence obtained through three warrantless searches. *Id.* The Government filed an opposition on August 15, ECF No. 61, and Defendant filed a reply on August 29, ECF No. 63. Based on representations made by the Government in its opposition, Defendant stated in his reply that the Court need only address the challenge to the warrantless search of Mr. Beverly's jacket on February 8, 2024. *Id.*

The Court conducted a motions hearing on September 12, 2025. During the hearing, the Government offered one witness, Detective Hunter Jewitt, and introduced several exhibits, including photos and video footage from officers' body cameras. ECF Nos. 67, 68. The Court reserved ruling on the Motion to Suppress and ordered supplemental briefing. The Government filed its supplemental brief on September 24, and Defendant filed his on October 1. Upon questioning by the Court, counsel for the parties further clarified their positions at the pretrial conference held on October 10.[1]

## II.   RELEVANT FACTS

Hunter Jewitt is a detective with the Baltimore City Police Department ("BPD"). On February 8, 2024, Detective Jewitt was assigned to the Eastern District Action Team, a unit

---

[1] In addition, the Court addressed pending motions in limine on the record during the pretrial conference.

responsible for investigating firearm, drug, and violent crimes in the Eastern District of Baltimore City. Detective Jewitt had nearly five years of experience as a BPD officer by February 2024 and had received training at the police academy on various topics, including firearms training, narcotics training, law training, and how to render medical aid. His firearms training gave him familiarity with the characteristics of an armed person.

On the evening of February 8, 2024, Detective Jewitt was patrolling the Eastern District with his partner Detective Bennett when they were alerted to the discharge of a firearm and directed to respond to the corner of the 400 block of North Potomac Street and the 1300 block of East Biddle Street. Detective Jewitt previously responded to numerous scenes of shootings and homicides in that area. Detectives Bennett and Jewitt were the first of several BPD officers to respond to the scene. Upon arrival, Detective Jewitt observed an individual later identified as James Beverly Jr., the defendant, laying on the sidewalk in front of a corner store. Mr. Beverly stated that he was shot multiple times. Detective Bennett advised dispatch of Mr. Beverly's injuries and called for a medic to provide aid.

Detective Jewitt also noticed that Mr. Beverly was surrounded by shell casings on the ground within a few feet of where he was laying, which was uncommon in Detective Jewitt's experience. The shell casings appeared shiny under flashlights, suggesting that they may have been recently discharged from a firearm. Based on these observations, Detective Jewitt believed that Mr. Beverly may have been armed with a firearm and that he may have discharged it. Detective Jewitt began to look for the firearm. He looked inside a nearby trash can and did not find any weapon there.

After other officers arrived on the scene, some began attempting to provide medical aid to Mr. Beverly. One officer cut Mr. Beverly's pants in an effort to locate his gunshot wounds. Cutting

3

the pants caused the contents of a pants pocket to fall out, including a wad of U.S. currency. Around that time, Mr. Beverly began speaking to a civilian bystander and asking her to take his coat, while he tried to take his jacket off with his one free arm.[2] At one point Mr. Beverly told this bystander that the officers said she could take his jacket and asked her to take it from him, but an officer told him, "No, not yet," and Mr. Beverly kept the jacket on his person. Detective Jewitt found Mr. Beverly's efforts to get rid of his jacket to be uncommon.

    Detective Jewitt soon went back to Mr. Beverly and reached toward the jacket Mr. Beverly was wearing. Mr. Beverly protested, saying that he was not shot in that area of his body, waving one of his arms in an apparent effort to deter Detective Jewitt from touching him, objecting to having the jacket checked, and stating effectively that he had his personal belongings in his jacket. As Detective Jewitt persisted in reaching for Mr. Beverly's jacket, Mr. Beverly complained to bystanders about the officers' actions and asked them to record the incident. One of the officers spoke to Detective Jewitt while making the hand gesture of a handgun, to which Detective Jewitt responded that that was what he was trying to find out, indicating that he was interested in determining whether Mr. Beverly had a firearm on his person. Detective Jewitt believed that a gun could be concealed within the jacket Mr. Beverly was wearing.

    At that point, Detective Jewitt knelt down and began searching the pockets of Mr. Beverly's jacket. The first pocket was on the lower right side and outside of the jacket. Detective Jewitt briefly handled this pocket, looking for a moment at the inside of the jacket, turning the outside pocket back toward him, and then immediately holding the pocket open with his left hand, sticking his right hand into the pocket, and removing items from inside the pocket to inspect them. Among those items were a set of keys, an identification card for Mr. Beverly, and suspected

---

[2] I note that Mr. Beverly called the bystander "Ma-Ma," but the bystander's identity is unknown, and there is no evidence that she was related to Mr. Beverly.

4

controlled substances. Detective Jewitt proceeded with searching other pockets of the jacket in the same manner. He testified that the recovery of suspected controlled substances expanded the scope of his search of the jacket, and he recovered more suspected controlled substances from other pockets. Detective Jewitt placed the items he found on the ground next to Mr. Beverly. At one point, he briefly pulled on the waistband of Mr. Beverly's underwear and asked him to roll over a bit so that the officer could see if the gun was under his body. After medics arrived and began rendering aid to Mr. Beverly, Detective Jewitt assisted in removing the jacket from Mr. Beverly's body, and he continued searching the jacket after that, pulling items from its pockets.

Detective Jewitt described the jacket as a puffy and bulky winter jacket. However, photos and body worn camera footage of the jacket show that the material of its pockets was pliable and easy to manipulate. During his handling and search of the jacket, Detective Jewitt never felt anything that felt like a handgun in terms of shape, firmness, or weight.

Mr. Beverly was soon transported from the scene to a local hospital. He was not arrested at that time. A firearm was later recovered from inside the corner store.

### III. DISCUSSION

Defendant seeks suppression of evidence recovered during the warrantless search of his jacket pockets, arguing that the search was unreasonable under the Fourth Amendment.

The exclusionary rule "generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights[.]" *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 359 (1998). The Fourth Amendment provides

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

5

U.S. Const. amend. IV.

"Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, [the Supreme Court] has inferred that a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459 (2011). In other words, as a general matter, "government agents cannot execute a search without first obtaining a warrant based on 'probable cause.'" *United States v. Taylor*, 54 F.4th 795, 803 (4th Cir. 2022) (quoting U.S. Const. amend IV). Probable cause alone does not dispense with the warrant requirement. As the Supreme Court stated in *Walter v. United States*, "if probable cause dispensed with the necessity of a warrant, one would never be needed." 447 U.S. 649, 657 n.10 (1980). The Supreme Court and the Fourth Circuit have long recognized as a "basic rule" that warrantless searches, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also Taylor*, 54 F.4th at 803; *United States v. Davis*, 690 F.3d 226, 241–42 (4th Cir. 2012).

To justify the warrantless search in the instant case, the Government invokes the exception for exigent circumstances. The exigent circumstances exception "applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *King*, 563 U.S. at 460 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). "The rationale underlying the exigent circumstances exception is a 'compelling need for official action and no time to secure a [search] warrant.'" *United States v. Curry*, 965 F.3d 313, 321 (4th Cir. 2020), *as amended* (July 15, 2020), *as amended* (July 16, 2020) (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)).

"In determining whether the exigent circumstances exception applies, courts must balance 'the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence,' against 'the reasons for prior recourse to a neutral magistrate.'" *United States v. Graham*, 686 F. App'x 166, 169–71 (4th Cir. 2017) (quoting *Arkansas v. Sanders*, 442 U.S. 753, 759 (1979), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991)). A warrantless search justified by exigent circumstances "must be 'strictly circumscribed' by the exigency that justifies the exception to the warrant requirement." *United States v. Schaffer*, 286 F. App'x 81, 84 (4th Cir. 2008) (quoting *Mincey*, 437 U.S. at 393). "[L]ike all exceptions to the warrant requirement, the exigent circumstances exception is a 'narrow' one that must be 'well-delineated in order to retain [its] constitutional character.'" *Curry*, 965 F.3d at 321 (quoting *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013)). To date, the Supreme Court "has identified only 'a few ... emergency conditions' that rise to the level of exigent circumstances," to include "(1) the need to 'pursue a fleeing suspect'; (2) the need to 'protect individuals who are threatened with imminent harm'; and (3) the need to 'prevent the imminent destruction of evidence.'" *Id.* (first quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984), and then quoting *Carpenter v. United States*, 585 U.S. 296 (2018)).

In the instant case, there was no pursuit of a fleeing suspect, and the Government does not contend that challenged search was necessary to prevent imminent destruction of evidence. The only arguably fitting type of exigent circumstance presented here is "the need to 'protect individuals who are threatened with imminent harm[,]'" which has been recognized to encompass the "emergency aid" exception to the warrant requirement. *Id.* at 322 (quoting *King*, 563 U.S. at 460). "[T]o determine whether a given emergency [of this type] justifies officers bypassing a Fourth Amendment protection, courts look to officers' 'objectively reasonable belief . . . based on

7

specific articulable facts and reasonable inferences that could have been drawn therefrom.'" *Id.* (quoting *Yengel*, 711 F.3d at 397). Under this approach, "in order for a warrantless search to pass constitutional muster, 'the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'" *Yengel*, 711 F.3d at 396–97 (quoting *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)). In *Curry*, the Fourth Circuit stated that although this approach

> may sound broad in name, it is subject to important limitations and thus is quite narrow in application. For example, the requirement that the circumstances present a true "emergency" is strictly construed—that is, an emergency must be "enveloped by a sufficient level of urgency." . . . Indeed, standing alone, even a "possible homicide" does not present an "emergency situation" demanding "immediate [warrantless] action."

965 F.3d at 322 (first quoting *Yengel*, 711 F.3d at 397, and then quoting *Mincey*, 437 U.S. at 392).

Here, first, the cutting of Mr. Beverly's pants, which resulted in the contents of his pants pocket being revealed and spilled onto the ground, was clearly justified by the effort to render emergency assistance to Mr. Beverly. *See, e.g.*, *United States v. Wilson*, 524 F.2d 595 (8th Cir. 1975). Therefore, the contents of Mr. Beverly's pants pocket are not subject to suppression.

The more difficult question is whether the search of Mr. Beverly's jacket pockets was justified by exigent circumstances or, more specifically, the "need to 'protect individuals who are threatened with imminent harm.'" *Curry*, 965 F.3d at 322. The Fourth Circuit has looked to "the non-exhaustive list of factors first provided in *United States v. Turner,* 650 F.2d 526, 528 (4th Cir. 1981)," for guidance "in determining whether an exigency reasonably justified a warrantless search." <u>Yengel</u>, 711 F.3d at 396–97. The *Turner* factors include:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility

8

>of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

*Id.* at 397 (quoting *Turner*, 650 F.2d at 528). "[N]o single factor is controlling. . . . Instead, exigencies must be judged in light of all of the relevant factors and from the totality of the circumstances known to the officer at the time of the warrantless intrusion." *Schaffer*, 286 F. App'x at 85 (citing *United States v. Reed,* 935 F.2d 641, 642 (4th Cir. 1991)).

Addressing the first *Turner* factor in the instant case, there was a degree of urgency involved in finding what Detective Jewitt suspected to be a nearby firearm that had been recently discharged in the vicinity of where Mr. Beverly was found injured on the ground. But the degree of urgency was not so high that Detective Jewitt lacked practicable and lawful options apart from a full-on warrantless search of Mr. Beverly's jacket pockets.

First, if Detective Jewitt believed there was probable cause that a firearm was concealed within the jacket, it would have been reasonable for him to seize Mr. Beverly's jacket and obtain a warrant to search it. Police officers are permitted to temporarily seize an item or container without a warrant where there is "probable cause to believe that [it] holds contraband or evidence of a crime" and "the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Place*, 462 U.S. 696, 701 (1983). More specifically, warrantless seizure is justified in circumstances where "the risk of the item's disappearance or use for its intended purpose before a warrant may be obtained outweighs the interest in possession." *Id.* at 701–02. One might ask, if the exigency here was sufficient to justify a warrantless *seizure* of the jacket, wouldn't it also justify warrantless *search* of the jacket? The answer to that question is no. A warrantless search justified by exigent circumstances "must be 'strictly circumscribed' by the exigency that justifies the exception to the warrant requirement."

*Schaffer*, 286 F. App'x at 84 (quoting *Mincey*, 437 U.S. at 393). While a warrantless *seizure* of Mr. Beverly's jacket would have been justified to prevent the loss of any firearm concealed inside, that seizure would have obviated the need for a warrantless *search*—a far more serious intrusion on the privacy interests the Fourth Amendment protects.[3] At the same time, seizing Mr. Beverly's jacket would have practically eliminated any danger Detective Jewitt believed Mr. Beverly posed to officers and bystanders on the scene. There would have been virtually no downside or risk associated with seizing the jacket and obtaining a warrant before searching its pockets.

Alternatively, in the absence of probable cause necessary to obtain a search warrant, Detective Jewitt could have conducted a *Terry* pat-down on the outside of the jacket pockets to confirm or dispel his suspicion that they contained a firearm. Under *Terry v. Ohio*, a police officer may frisk or pat down a lawfully stopped suspect if the officer reasonably believes that the person is armed and presently dangerous. *See* 392 U.S. 1, 30 (1968); *United States v. Brown*, 114 F.4th 253, 259 (4th Cir. 2024). However, the Supreme Court has "repeatedly emphasized that '[t]he purpose of' the 'limited search' authorized by *Terry* 'is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.'" *United States v. Buster*, 26 F.4th 627, 634 (4th Cir. 2022) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)). Accordingly, as Judge Bennett recently recognized in *United States v. Chase*, "[t]he scope of a

---

[3] As the Supreme Court has explained:

> [A] seizure affects only possessory interests, not privacy interests. Therefore, the heightened protection we accord privacy interests is simply not implicated where a seizure of premises, not a search, is at issue. We hold, therefore, that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents. We reaffirm at the same time, however, that, absent exigent circumstances, a warrantless search … is illegal.

*Segura v. United States*, 468 U.S. 796, 810 (1984).

10

*Terry* frisk is not the same as the scope of a search[.]" Crim. No. RDB-23-0296, 2025 WL 934511, at *7 (D. Md. Mar. 27, 2025). "The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." *Sibron v. New York*, 392 U.S. 40, 65 (1968); *see also United States v. Mayo*, 361 F. 3d 802, 805 (4th Cir. 2004) ("[I]f the officer believes that the person being stopped 'may be armed and presently dangerous,' the officer may frisk the person *by patting his outer clothing* in an attempt to discover weapons . . . .'" (quoting *Terry*, 392 U.S. at 30) (emphasis added)). This limitation on a protective search for weapons under *Terry* reflects the principle that "[a]n officer is not justified in conducting a general exploratory search for evidence under the guise of a stop-and-frisk." *United States v. Swann*, 149 F.3d 271, 274 (4th Cir. 1998). Investigative methods employed under the *Terry* standard "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Chase*, 2025 WL 934511, at *8 (quoting *United States v. Meyers*, 760 F. App'x 181, 186 (4th Cir. 2019). As Judge Bennett explained in *Chase*:

> Immediately reaching into a subject's pocket during a frisk is unreasonable because it goes beyond the scope of *Terry*. . . . In *Sibron v. New York*, 392 U.S. 40 (1968), the Supreme Court explained that even where officers reasonably suspect an individual subject to a *Terry* frisk is armed and dangerous, reaching directly into the individual's pocket without an over-the-clothes pat-down violates the Fourth Amendment because such conduct is "not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man."

*Id.*; *see also United States v. Santillanes*, 848 F.2d 1103, 1109 (10th Cir. 1988); *United States v. Casado*, 303 F.3d 440, 448–49 (2d Cir. 2002).

Here, the Government does not argue that Detective Jewitt's search of Mr. Beverly's jacket pockets was justified by *Terry*. And for good reason. By reaching directly into Mr. Beverly's jacket

11

pocket without first attempting to assess whether a gun might be found inside it, Detective Jewitt's search was not the least intrusive means reasonably available to confirm or dispel the officer's suspicion that Mr. Beverly was armed.

     Detective Jewitt testified that he had experience patting down jackets with pockets that had guns inside. But he also testified that, on occasion, especially in the winter, he could not confidently tell whether a heavy, bulky, or thick coat contained a gun from patting it down. And he testified that Mr. Beverly's jacket was puffy and bulky and that he "couldn't confidently feel the outer garments." Although, from the body worn camera footage, the material of the jacket appeared to be thicker than perhaps a windbreaker or a sweatshirt, I find that it was not so thick that a reasonable effort to pat it down to detect the presence of a handgun could not be made. Observing Detective Jewitt manipulate the pockets of the jacket—particularly, the first pocket he searched—showed the material to be flimsy and pliable, easily yielding in Detective Jewitt's hands. From careful examination of the video evidence, I find that the officer could have felt and manipulated the pocket from the outside to make a reliable determination of whether it concealed a firearm. The material was not so thick, stiff, or heavily padded as to confound discovery of whether something so weighty, firm, and distinctive in shape as a handgun was inside. Even if an effort to feel and manipulate the pocket from the outside left Detective Jewitt uncertain as to whether a handgun was inside the pocket, he could have tried feeling inside the pocket for the gun without removing the items inside. But none of these less invasive efforts were made. Instead, Detective Jewitt pulled the pocket open and appeared to look inside it while he stuck his other hand directly into the pocket and immediately pulled items out of it. In doing so, he showed no signs or indication that he attempted to feel for the presence of a hard, weighty, L-shaped object that could be a handgun before pulling out and revealing the pocket's contents and examining

12

those items. I cannot find that taking such an invasive step at the outset was necessary to determine whether Mr. Beverly was armed.

What occurred here clearly exceeded the limits of a justifiable *Terry* search, and what urgency Detective Jewitt faced did not justify exceeding those limits. Detective Jewitt went directly into Mr. Beverly's jacket pockets and pulled items out with any appreciable attempt to feel their contents to confirm or dispel his suspicions, and without regard to Mr. Beverly's privacy interests. Applying the exigency exception to the instant case would work an end-run around limits binding precedent places on protective searches under *Terry*. *Cf. Curry*, 965 F.3d at 316 (recognizing that applying the exigent circumstances doctrine to justify a suspicion-less *Terry* stop would risk allowing the exigency exception to "swallow *Terry* whole"). In sum, considering that constitutionally permissible options were available to Detective Jewitt and were sufficient to address his need to safely determine whether Mr. Beverly's jacket contained a firearm, I find that the first *Turner* factor weighs against the warrantless search in this case.

The second *Turner* factor is the officer's reasonable belief that contraband is about to be removed or destroyed. The parties agree that this factor does not apply to the circumstances of this case.

The third *Turner* factor is "the possibility of danger to police guarding the site[.]" *Turner*, 650 F.2d at 528. In *United States v. Legg*, the Fourth Circuit recognized that "the possibility of a threat to the safety of law enforcement officers may constitute exigent circumstances justifying a warrantless search or seizure." 18 F.3d 240, 244 (4th Cir. 1994). Here, there was certainly some possibility of danger to the officers and bystanders on the scene. Detective Jewitt described his interest in finding the weapon as a matter of officer safety and public safety. I do not find, however, that there was a sufficient likelihood of violence to justify the warrantless search, considering that

13

law enforcement clearly controlled the scene at the time the warrantless search was conducted, and the person suspected to be in possession of the gun was injured and immobilized. While the body worn camera footage shows the officers on the scene to be alert, they were not alarmed. No officer on the scene drew her or his weapon at any point during the relevant period. And bystanders complied with officers' instructions to stand back and away from the scene. Detective Jewitt testified that he did not perceive the bystanders to be threats to officer safety. The scene was well under the control of the officers.

I recognize that Detective Jewitt suspected that Mr. Beverly had a gun concealed in his jacket and could have reached the gun, even in his injured state. But this situation is no different from the typical situation that justifies a *Terry* pat-down or frisk of a person suspected to be armed and dangerous. The purpose of a protective search under *Terry* is to dispel risks to officer safety, and, as explained *supra*, the warrantless search Mr. Beverly's jacket unreasonably exceeded the limits of a *Terry* pat-down. A properly limited protective pat-down of the jacket would have sufficed to address what risk to safety existed on the scene. For these reasons, I find that the third *Turner* factor does not weigh in favor of the warrantless search that was conducted instead.

The fourth *Turner* factor is "information indicating the possessors of the contraband are aware that the police are on their trail[.]" *Turner*, 650 F.2d at 528. Mr. Beverly's initial resistance to Detective Jewitt's efforts to touch and search his jacket clearly gave rise to a reasonable suspicion that Mr. Beverly was acting out of an awareness that the police were "on [his] trail." *Turner*, 650 F.2d at 528. But, again, this would have served as a reason to seize the coat for purposes of obtaining a search warrant or patting it down to ascertain the presence of a gun. Mr. Beverly did not threaten violence against anyone, whether through words or actions; nor did he show any signs of an intent to flee. To the contrary, between his injuries and the fact that he was

14

surrounded by police officers, Mr. Beverly was in no position to flee. His behavior did not justify a full-on search of his jacket pockets without a warrant or without first attempting to detect the presence of a firearm through a pat-down or frisk.

Turning to the fifth *Turner* factor—"the ready destructibility of the contraband[,]" *id.*—the parties agree that it does not apply here.

On balance, I do not find that the *Turner* factors justify the warrantless search of Mr. Beverly's jacket pockets. A "true 'emergency'" sufficient to permit a warrantless search is so "strictly construed" that not even a "possible homicide[,]" standing alone, meets this standard. Curry, 965 F.3d at 322 (citation omitted). The circumstances of this case did not present a "true" emergency so great in urgency as to excuse the officer from the Fourth Amendment's warrant requirement and from the limitations of a protective search for weapons under *Terry*. Other options available to the officer included seizing the jacket and getting a warrant to search it, or at least attempting to pat the jacket down to see if a gun could be detected, and neither of these options would have any less safe that the warrantless search that was conducted.

Notably, the *Turner* court recognized that "emergency circumstances will vary from case to case and the inherent necessities of the situation at the time must be scrutinized." *Turner*, 650 F.2d at 528. Special circumstances have caused the Fourth Circuit to expand upon the analytical framework of the *Turner* factors, such as where, in *Mora v. City of Gaithersburg*, there was an "overwhelming need to prevent harm to the public where police had received a hotline tip that the suspect was intent on committing mass murder." <u>Yengel</u>, 711 F.3d at 397 (citing *Mora v. City of Gaithersburg*, 519 F.3d 216, 224–25 (4th Cir. 2008)). In that case, the court held that "a warrantless search of a suspect's luggage, van, and apartment was constitutional[]" because the "likelihood,

urgency, and magnitude of [the] threat" increased "the justification for and scope of police preventive action." *Id.* (quoting *Mora*, 519 F.3d at 224).

I do not find the instant case to be a protective action case. There was no actionable threat at the time the warrantless search of the jacket was conducted. A shooting had occurred shortly beforehand, and Mr. Beverly had been injured in that shooting. But there was nothing to suggest that any specific threat of continuing violence was present. To find any risk of continuing gun violence here sufficient to justify warrantless searches would risk expanding the exigency exception grossly out of proportion and fly in the face of longstanding precedent that this exception is "narrow" and "well-delineated." *Yengel*, 711 F.3d at 396 (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999)); *see also Katz*, 389 U.S. at 357.

Relatedly, I note that none of the cases the Government cites in its briefing support its position that the search of Mr. Beverly's jacket pockets was justified by exigent circumstances. The case that comes closest is *United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir. 2012), but the facts of that case are quite different from those before me. *Laudermilt* involved a protective sweep of a house that was conducted during "a potentially volatile situation involving a firearm and a domestic dispute," involving threats the defendant made against his girlfriend and her family. 677 F.3d at 610. The officers conducted the protective search at a point when the defendant's gun was unsecured and there may have been multiple people on the premises who were unaccounted for. *Id.* at 609–10. In other words, the police lacked control of the scene when they conducted the search challenged in that case, *id.* at 610–11, and the Fourth Circuit found the search to be reasonable in the circumstances, *id.* at 608, 613.

Here, in contrast, the officers had control of the scene. It was not volatile. Detective Jewitt was looking for a weapon that he suspected was on the scene, but he had no reason to believe at

that time that any of the civilian bystanders were aware of the potential presence of an unsecured firearm. Moreover, those bystanders were compliant with instructions to step away from the scene, and they were kept several yards away, from my assessment of the body worn camera footage.

Ultimately, the record before me does not support the conclusion that an objectively reasonable officer in Detective Jewitt's circumstances would so fear for the safety of himself and others on the scene that he could not either seize Mr. Beverly's jacket and seek a warrant to search it or attempt a *Terry* pat-down before going into its pockets and pulling out the contents without warrant. These constitutional alternatives would have posed no risk to safety substantial enough to justify the invasive warrantless search Detective Jewitt conducted. There was not a "compelling need" for the warrantless search in this case, *McNeely*, 569 U.S. at 149, and the search was not "strictly circumscribed" by the exigency offered to justify it, *Mincey*, 437 U.S. at 393. The search was, therefore, unreasonable under the Fourth Amendment, and its fruits must be suppressed.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 57) is granted in part and denied in part. The motion is granted as to the search of Defendant's jacket, and evidence derived from that search are suppressed. Defendant's motion is denied in all other respects. A separate Order will issue.

 10/15/25   
Date

 /S/   
Matthew J. Maddox  
United States District Judge